WAGNER, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–700–CR. Submitted on briefs January 31, 1979.—*
*Decided May 1, 1979.*
(Also reported in 277 N.W.2d 849.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Marguerite M. Moeller,* assistant attorney general.

SHIRLEY S. ABRAHAMSON, J. Wagner seeks review of his conviction of first-degree murder on the

ground that his confession which was admitted in evidence was obtained during an unreasonably long detention. We affirm the trial court's judgment of conviction and order denying Wagner's motion for a new trial.

On January 1, 1975, the body of Suzan Reignier was found in a creek bed in Brown county.

On April 13, 1975, personal property belonging to the deceased girl was found in Brown county near property owned by Wagner's uncle and grandmother. At about 11:30 p.m., on April 14, 1975, Wagner and a friend arrived at the Green Bay Police Department bringing a purse belonging to the deceased girl.

Shortly after midnight on April 15, 1975 the police took Wagner and his friend to the Brown County Sheriff's Department where Wagner explained that they found the purse that evening. Wagner was asked to return later that morning. At about 9:15 a.m., April 15, Wagner and his friend returned voluntarily to the Brown County Sheriff's Department, and Wagner gave a statement about the purse to Captain Richard Schrickel. At about 10:15 a.m. Wagner was turned over to Lt. Van Straten to take a polygraph test. At about 11:00 a.m. Wagner and the lieutenant returned to Captain Schrickel. Wagner said that he did not want to take the test, but that he wanted to change his story. Between 11:00 and 11:24 a.m. Wagner was informed of his constitutional rights; he gave a second statement which indicated that he found the purse and a knife sometime soon after January 1, 1975. At about 11:30 a.m. Wagner accompanied the lieutenant a second time to take a polygraph test but then refused to take the test. At about 12:30 p.m. Wagner was asked to give a tape-recorded statement, and a statement was taken. Between 1:30 p.m. and 3:30 p.m. Wagner was driven to the boarding house where he resided at the time of the murder and he identified the location of the knife. At about 3:30 p.m. the sheriff's

department called Wagner's probation agent to put a probation hold[1] on him so that there could be further investigation of Wagner's involvement in the murder.

Herger, the probation officer, advised the sheriff's department that he would check Wagner's file to determine if he were willing to place a hold on Wagner. Herger authorized the hold, and Wagner was booked as a probation hold at about 3:40 p.m. on April 15, 1975. He was not interrogated again until the next morning (April 16) at 8:45 a.m. when, after being reminded of his rights, he made another exculpatory statement. This

[1] Sec. 973.10, Stats., provides:

"973.10 **Control and supervision of probationers.** (1) Imposition of probation shall have the effect of placing the defendant in the custody of the department and shall subject the defendant to the control of the department under conditions set by the court and rules and regulations established by the department for the supervision of probationers and parolees.

"(2) If a probationer violates the conditions of probation, the department may:

"(a) If the probationer has not already been sentenced, order the probationer brought before the court for sentence which shall be imposed without further stay, and the sentence may be concurrent with or consecutive to any sentence imposed subsequent to the imposition of the original probation; or

"(b) If the probationer has already been sentenced, order the probationer to prison, and the term of the sentence shall begin on the date the probationer enters the prison.

"(3) A copy of the order of the department shall be sufficient authority for the officer executing it to take the probationer to court or to prison. The officer shall execute the order as a warrant for arrest but any officer may, without order or warrant, take the probationer into custody whenever necessary in order to prevent escape or enforce discipline or for violation of probation."

Dawson, Sentencing, p. 168 (1969): "The probation violation hold is an informal device by which the probation officer vicariously exercises his power to arrest without a warrant for probation violation. He simply notifies the police to arrest the probationer and files a document with the jail to authorize his detention."

interrogation ended at 9:40 a.m., when Wagner accompanied sheriff's officers to investigate further evidence. It appears that Wagner was returned to his cell at about 10:10 a.m. where he remained until 2:15 p.m.

At 2:15 p.m., April 16, the interrogation began which led to Wagner's confession. From 2:15 to 3:00 Wagner was questioned by Green Bay police officers Rice and Steeno. Wagner repeated his previous story. At 3:00 p.m. Captain Schrickel and Sheriff Froelich entered the interrogation room. Wagner was told that his fingerprint had been found in dried blood on the knife thought to have been used in the murder and that such a print could have been left only when the blood was still fresh. Captain Schrickel told Wagner that "this is your Waterloo." Shortly after 3:00, Wagner requested that Schrickel and Froelich leave the room. After being given his rights again, Wagner told Rice and Steeno that he had killed the girl. Officer Steeno wrote down Wagner's account of the murder. Wagner signed the confession at 6:10 p.m., April 16. He was then charged with first-degree murder and was brought before a judge.

After a lengthy *Goodchild-Miranda* hearing,[2] the trial court denied Wagner's motion to suppress the confession and various other statements he had made to the police. Wagner entered pleas of not guilty and not guilty by reason of mental disease or defect. At a bifurcated trial, the jury found Wagner guilty of first-degree murder and found that he had not been suffering from mental disease or defect. Wagner was sentenced to life imprisonment.

---

[2] *Roney v. State*, 44 Wis.2d 522, 533, 171 N.W.2d 400 (1969): ". . . In *Miranda* the question is, was the confession or other statement obtained under such circumstances of custodial interrogation as to require the exclusion of the statement from evidence. In *Goodchild* the question is, was the statement involuntary and therefore should be excluded from evidence. . . ."

Wagner contends on appeal that the confession was obtained during an unreasonably long period of detention and is therefore inadmissible in evidence.

This court has recognized that authorities may detain a person suspected of a crime for a period of time after arrest in order to determine whether to release the suspect or to make a formal complaint. *Phillips v. State,* 29 Wis.2d 521, 534, 139 N.W.2d 41 (1966). But an unreasonably long detention before release or initial appearance before a judge[3] constitutes a denial of due process under Art. I, sec. 8, of the Wisconsin Constitution[4] and renders inadmissible any confession, whether voluntary or involuntary, obtained from the suspect during the detention. *State v. Benoit,* 83 Wis.2d 389, 405, 265 N.W.2d 298 (1978) ; *State v. Wallace,* 59 Wis.2d 66, 75, 207 N.W.2d 855 (1973) ; *State v. Hunt,* 53 Wis.2d 734, 741, 193 N.W.2d 858 (1972) ; *Reimers v. State,* 31 Wis.2d 457, 468, 143 N.W.2d 525 (1966) ; *Phillips v. State, supra,* 29 Wis.2d at 534–35. Long detentions are looked upon with extreme disfavor by this court. *State ex rel. Van Ermen v. Burke,* 30 Wis.2d 324, 338, 140 N.W.2d 737 (1966).

---

[3] Sec. 970.01(1), Stats., provides:

"970.01 **Initial appearance before a judge.** (1) When any person is arrested he shall be taken within a reasonable time before a judge in the county in which the offense was alleged to have been committed."

[4] Art. I, sec. 8, Wis. Const.:

"No person shall be held to answer for a criminal offense without due process of law, and no person for the same offense shall be put twice in jeopardy of punishment, nor shall be compelled in any criminal case to be a witness against himself. All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great; and the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it."

This court has not established a set period of time beyond which the suspect must either be released or charged. We have said that post-arrest detention will be permitted as long as the detention is for a proper purpose, *Phillips v. State, supra,* 29 Wis.2d at 533, and the period of detention is not unjustifiably long under the circumstances of the case. *State v. Wallace, supra,* 59 Wis.2d at 77. Activities that the authorities might reasonably undertake in order to determine whether to release or to charge include interrogating the suspect or witnesses, checking out the story told by the suspect or witnesses, and gathering evidence. *State v. Hunt,* 53 Wis.2d at 742.

Because Wagner's contacts with the police and sheriff's officers were voluntary from the late evening of April 14 until he was placed on probation hold at about 3:40 p.m. on April 15, 1975, the trial court, Wagner, and the State compute the period of detention at issue in the case at bar as starting at the time the probation hold was placed. *State v. Hunt,* 53 Wis.2d at 742. After signing his written confession at 6:10 p.m., April 16, 1975, Wagner was taken before a judge early that evening. Therefore the period of detention at issue ran for about twenty-seven or twenty-eight hours.

Wagner asserts that a detention of this duration was unreasonable. In support of this contention Wagner maintains that his detention under a probation hold was a subterfuge and that the police and sheriff's officers "worked upon" him while he was in custody in order to obtained a "sew-up" confession.

Wagner first argues that the probation hold was imposed not because he violated a condition of probation but because the police needed Wagner in custody to question him about his involvement with the murder. Thus the use of the probation hold was a subterfuge or deception.

Captain Schrickel testified that he requested the probation officer to put a "hold" on Wagner because Wagner had changed his story, that "things weren't adding up" and the department needed time to complete its investigation. The probation officer testified that Wagner had been delinquent in contacting him for four months, that the officer had written Wagner several letters asking him to report in person and advising him that his failure to report was a violation of his probation agreement, and that it was rumored that Wagner was behaving oddly. The probation officer testified that he authorized a hold on the basis of these factors as well as on the basis of the information that Wagner was suspected of being involved in a serious crime.

The liberty enjoyed by a probationer is conditioned on his or her adhering to the conditions of probation as set forth in the probation agreement. *State v. Evans*, 77 Wis.2d 225, 230, 252 N.W.2d 664 (1977). The conditions of probation are supposed to be tailored to serve the dual purposes of probation, *i.e.* to protect the public from criminal conduct and to help the probationer become a useful member of society. Therefore it is a condition of a sentence to probation that the probationer lead a law-abiding life during the period of his or her probation. Standard 3.2(a) of the American Bar Association's Standards Relating to Probation (Approved Draft 1970), adopted in *State v. Garner*, 54 Wis.2d 100, 105–106, 194 N.W.2d 649 (1972). This court has said that it is an absolute obligation of the probationer to keep his or her probation agent informed of his or her whereabouts and activities when requested. *State v. Evans, supra*, 77 Wis.2d at 231. The supervisory function of the probation agent serves both the public protection and the rehabilitative purposes of probation.

The trial court found that Wagner was detained on a probation hold because the probation officer and the

sheriff's department believed in good faith that the probation officer had a legal right to place a hold on Wagner to fulfill the purposes of probation. The trial court concluded that there was no deception or subterfuge in the placing of the hold.[5]

Wagner further argues that the detention was unreasonably long because the police used the detention not for the permissible purposes of interrogation and gathering evidence but rather in the attempt to coerce a confession. Wagner maintains that the authorities exerted considerable psychological pressure on him in order to induce him to confess to the murder.[6]

Wagner asserts that the police and sheriff's officers subjected him to two days of interrogation and excursions to gather evidence; that they refused to honor his request to see his probation agent; that they did not permit him to see his girlfriend; and that they deceived him into confessing by their statement that his fingerprint was on the knife, a fingerprint identification which Wagner says was not proved at trial. Wagner argues that this police conduct was impermissible and that he was detained for the purpose of being subjected to this conduct, not for permissible purposes.

We conclude, as did the trial court, that the police activities during Wagner's detention were reasonably and efficiently directed to determining whether or not to

[5] In raising the defense of "subterfuge," Wagner does not argue that the probation hold constituted an illegal arrest under the Fourth Amendment to the United States Constitution, that the confession was a direct result of that arrest, and that therefore the confession is inadmissible. *State v. Loeffler,* 60 Wis.2d 556, 561, 211 N.W.2d 1 (1973); *Brown v. Illinois,* 422 U.S. 590 (1975).

[6] It should be noted that the trial court found that the confession was voluntary, and on appeal Wagner does not contend that this finding is against the great weight and clear preponderance of the evidence. *State v. Carter,* 33 Wis.2d 80, 90–91, 146 N.W.2d 466 (1966).

charge him and that the police authorities did not utilize the period of detention to attempt to coerce a confession.

During the sixteen hour period preceding the probation hold Wagner voluntarily underwent about one and one-half hours of questioning. From the time he was placed on probation hold until he was brought before a judge, Wagner was subjected to at most five hours of questioning. He was not questioned on April 15 after the hold was placed late in the afternoon. The next morning he was questioned from 8:45 until 9:40 a.m., at which time he consented to a search and accompanied officers to investigate further evidence. He was in his cell from about 10:10 a.m. to 2:15 p.m., when his final period of questioning began. This last questioning lasted until 6:10 p.m., when he signed a written confession. Wagner began his confession shortly after 3:00 p.m. During the time Wagner detailed his inculpating account of the murder, his interrogation consisted primarily of being asked "What happened next?"

The evidence further shows that after the probation hold was placed on April 15, Wagner was permitted to see and did see his girlfriend, as well as to eat and sleep. Wagner's probation officer was not free to see him on April 15 after the hold was placed, but according to Wagner's testimony the probation officer did see Wagner at the jail the morning of April 16.

Officer Laes testified that early in the afternoon of April 16 he was asked to examine the knife for fingerprints. Officer Laes concluded that Wagner's print was on the knife. The Sheriff and Captain Schrickel then confronted Wagner with the fingerprint evidence. Shortly thereafter Wagner made an oral confession. The trial court found that the statements by the officers that Wagner's print was on the knife motivated Wagner's confession. The trial court further found that when the officers made those statements they believed them to

be true. The trial court concluded that even if none of the statements regarding the fingerprint could be verified later, as the State concedes, the confession was not induced by deliberate deceit or misrepresentation. *Blaszke v. State*, 69 Wis.2d 81, 88–89, 230 N.W.2d 133 (1975).

Under the circumstances of this case we conclude that the detention was used for proper and efficient investigation and interrogation, that the police did not detain Wagner in order to subject him to a strong inquisitorial attack, and that therefore the period of Wagner's detention was not unreasonably long.

*By the Court.*—Judgment and order affirmed.